IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2017

**STATE OF TENNESSEE v. D'MARIS LAQUANN FULLER**

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-3322    Cheryl A. Blackburn, Judge**

_____

**No. M2016-00412-CCA-R3-CD**

_____

A Davidson County Criminal Court Jury convicted the Appellant, D'Maris Laquann Fuller, of aggravated robbery.  The trial court sentenced the Appellant as a Range I, standard offender to ten years in the Tennessee Department of Correction.  On appeal, the Appellant contends that the trial court erred by refusing to allow him to play a recording of a 911 call, that the evidence was insufficient to sustain his conviction, and that the trial court erred when determining the length of his sentence.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Manuel B. Russ (on appeal) and Jason Chaffin (at trial), Nashville, Tennessee, for the Appellant, D'Maris LaQuann Fuller.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn Funk, District Attorney General; and Megan King and Leandra Varney, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The Appellant and his co-defendant, Enrique Demontez Newbell, were indicted for the aggravated robbery of the victim, Thomas Lanier.  At a joint trial, the victim testified that around 3:00 p.m. on Sunday, August 11, 2013, he was picked up at home by Newbell; Deron Garrett, whose nickname was "Speedy"; and a man he identified only as

"Doc." Newbell, who was driving Garrett's red Mustang, took them to Garrett's apartment. Four people were at Garrett's apartment when they arrived. Thereafter, Garrett and his guests smoked marijuana, played basketball, and gambled, and the Appellant, whom the victim knew as "D," arrived at Garrett's apartment. The victim did not have a relationship with the Appellant or Newbell, but he knew they were friends with Garrett. The victim said that he saw the Appellant with a gun at Garrett's apartment.

The victim said that he had been working for Federal Express since February 13, 2013, and that he had saved $2,000 to buy a car. He kept the money with him in twenty-dollar bills "balled . . . with a rubber band wrapped around it." He took the cash to Garrett's apartment because he "was trying to be flashy." The Appellant was at the apartment when the victim got out his money to gamble, but Newbell was not present. The victim recalled that he took out his money three times that weekend and that he talked about having the money with him.

The victim said that he and the other guests spent the night at Garrett's apartment. The next day, they gambled on dice, video games, and a football game that was on television, then they started to "wrap[] it up" and "get[] back to their daily routine."

Around 1:00 or 2:00 p.m., the Appellant and Newbell left Garrett's apartment, but Newbell returned sometime later. Thereafter, the victim, Newbell, Garrett, and a man known as "Jonas" or "Big J" got into Garrett's red Mustang. Newbell drove them to get Big J's paycheck, then he left Garrett and Big J at Garrett's mother's house in Highland Ridge. Next, Newbell drove the victim to a Captain D's restaurant to buy food then "dropped [the victim] off" at the end of the victim's street around 7:45 or 8:00 p.m. The victim was not concerned that Newbell had not driven him to his house. The victim had last used marijuana before 3:00 p.m. and did not feel "under the influence" at the time he got out of the car.

Less than ten seconds after the victim got out of the car, two men jumped from behind some bushes. One of the perpetrators pointed a gun at the victim's face, cocked the gun, and "told [him] to come out with everything." The victim recognized the Appellant's voice. The Appellant threatened to shoot the victim if he did not comply in "a certain amount of time." The Appellant had a black shirt wrapped around the lower part of his face, and he was wearing the same shorts he was wearing earlier that day at Garrett's apartment. The other perpetrator did not have a gun and had "his shirt pulled over his face."

The victim said that he tried to give the perpetrators only his wallet, which contained approximately forty dollars. The wallet had sentimental value for the victim because it had been "passed down" from his grandfather. After the Appellant grabbed the wallet, he ordered the victim to remove his pants. The victim took off his white

shorts and threw them on the ground. The victim's keys, cellular telephone, telephone charger, and bundled cash were in the pockets of his shorts. The victim said that he had spent some of his money but that he had between $1,800 and $2,000 in the bundle. While the unarmed perpetrator picked up the victim's shorts, his shirt fell off of his face, but the victim did not recognize him. The perpetrators also took the food the victim had bought at Captain D's. The perpetrators told the victim that he "had a few seconds to get home or whatever or they was [sic] going to shoot." The victim ran home, and the perpetrators ran away from the scene. The victim estimated the robbery lasted forty-five seconds to one minute.

When the victim arrived home, he "banged on the door," and his mother let him inside the house. The victim told her that he had been robbed, and she called 911. The victim spoke with the 911 operator, described the robbery, and said that the perpetrators were two black men. The victim said that he "wasn't talking clear" during the call because he was "really upset."

After the police arrived at the victim's home, they asked for details about the robbery. The victim responded that the perpetrators had taken his clothes. The police asked the victim to describe the clothes, and the victim said that he was wearing white shorts. The victim said that when he mentioned the white shorts, "it was like something triggered and [the police] just ran out of [his] house." The victim estimated that the police were at his house for five minutes.

The victim said that "at some point," the police returned to his house. The officers informed him that they had found his shorts and wanted him to go with them to see if he could identify the perpetrators. Around 8:45 p.m., the officers took the victim to "Doverside by Walmart." The officers got three suspects out of separate patrol cars "one by one," and the victim identified them as the perpetrators. One of the perpetrators was the Appellant, who was wearing the same clothes he had on at Garrett's house. The victim said that he was positive of his identification of the Appellant. The victim also identified Newbell as the man who drove him home immediately before the robbery, and Dezzion Pickett as the unarmed perpetrator who retrieved the victim's shorts from the ground. The victim said that the police returned all of the stolen items except his money.

On cross-examination, the victim said that Newbell did not gamble with the other men at Garrett's apartment; he merely was "hanging out." The victim said that he purchased marijuana from Newbell and Garrett but that he "didn't really have anything to do with" Newbell.

The victim said that he did not recognize the Appellant until he heard the Appellant's voice and saw his clothes. The victim had never seen the unarmed perpetrator, Pickett, prior to the robbery.

- 3 -

The victim said that he was "close friends" with Big J, "Big Al," and Doc, who were at Garrett's apartment on Sunday night. The victim recalled that all of the guests spent Sunday night at Garrett's apartment. Most of the guests stayed up late; the victim went to sleep around 1:00 or 1:30 a.m. The victim did not know the Appellant and did not talk much with him. On Monday, the Appellant left Garrett's apartment with Newbell two or three hours before the victim left. The victim acknowledged that he smoked marijuana but denied using "Xanax bars."

The victim said that he was positive of his identification of the Appellant at the time of trial but acknowledged that he did not identify the Appellant during the 911 call because he was not "sure who robbed [him] at first." The victim conceded that he did not "get a good look" at the Appellant's gun during the robbery and that he was not "paying attention and looking at faces" while he was "having to take [his] clothes off." The victim said that he told the 911 operator that both perpetrators were young black men wearing black shirts and shorts. The main difference between the perpetrators was that one had long hair in dreadlocks and that the other had shorter hair.

The victim said that when the police got the perpetrators out of the patrol cars, he realized that the Appellant was one of the people he had been with at the apartment. The victim noted that the Appellant did not have a shirt covering his face when he got out of the police car.

The victim said that at the time of the robbery, he was earning an average of $280 per week, which was about $1,000 per month. The victim did not have a bank account, and he cashed his checks at Walmart. The victim said that he was carrying a "huge wad" of twenty-dollar bills, which was "all the money to [his] name."

On redirect examination, the victim reiterated that he recognized the Appellant's voice during the robbery but that "[i]t took a moment for it to sink in[.]" He said that he was still upset when he spoke with the police.

The victim's mother, Cynthia Lanier, testified that shortly after 8:00 p.m. on Monday, August 12, the victim "bang[ed] on" the front door. She opened the door and saw the victim wearing only his tennis shoes, underwear, and undershirt. Ms. Lanier asked what had happened, and the victim responded that he had been robbed at gunpoint at the end of the street and that the perpetrators took his clothes, cellular telephone, money, wallet, and food. Ms. Lanier said that the victim did not appear to be under the influence of any substances. Ms. Lanier called 911, and the police came to her house within ten to fifteen minutes. The police stayed less than twenty minutes but returned fifteen to thirty minutes later and left with the victim.

- 4 -

On cross-examination, Ms. Lanier said that the victim did not tell her the names of the perpetrators but that he described the perpetrators as two young black men. When the 911 operator asked for a description of the perpetrators, Ms. Lanier handed the telephone to the victim.

Metropolitan Nashville Police ("Metro") Detective Eric Funk testified that on August 12, 2013, he was training Officer Seth Oden. At 8:11 p.m., Detective Funk saw a "maroon dark reddish color Mustang" coming from the intersection of Eaglewood Lane and Doverside Drive. The vehicle's lights were off. Detective Funk activated his car's emergency equipment and pulled over the vehicle. Detective Funk approached the driver's side of the Mustang, and Officer Oden approached the passenger's side. Newbell was in the driver's seat, the Appellant was in the front passenger's seat, and Pickett was sitting behind the front passenger's seat. Pickett and the Appellant were eating. Detective Funk saw a white pair of pants on the back seat beside Pickett.

Detective Funk asked Newbell to provide his driver's license, but Newbell provided only an identification card. Detective Funk researched Newbell and learned that his driver's license had been revoked. As Detective Funk was writing Newbell a citation, he received a report of a nearby robbery. The robbery was a "higher priority," so Detective Funk told Newbell that he would not get a citation but that he was not to drive without a license. Detective Funk suggested that the men walk to their destination, then Detective Funk and Officer Oden left and went to the victim and his mother's home.

When Detective Funk went inside the victim's residence, the victim was standing in the kitchen wearing boxer shorts and talking on a cordless telephone. He seemed "very worked up." Detective Funk asked what color pants the victim had been wearing, and the victim said that his pants were white. Detective Funk and Officer Oden left the victim's residence after thirty or forty seconds. They notified other officers that they were going to pursue Newbell, Pickett, and the Appellant because Detective Funk had seen white pants in the back of Newbell's car. Around 8:23 p.m., which was less than one minute after they left the victim's residence, Detective Funk saw the three suspects walking along Doverside Drive and stopped them. Officers Otto and Woosely were also at the scene. Officer Oden spoke with Pickett and searched him. During the search, Officer Oden found $1,460, which was comprised of seventy-three twenty-dollar bills, in Pickett's left front pants pocket. The cash was folded around a .25 caliber semi-automatic pistol that was "fully loaded with one in the chamber." Detective Funk recalled that when he "approached the car after everybody was detained," he noticed the white pants that were in the back of the car had been thrown into a "side ditch." Detective Funk also recovered a Cricket cellular telephone from Pickett.

On cross-examination, Detective Funk said that Newbell was not "overly nervous" when the detective stopped him for driving with his lights off.

Metro Police Sergeant Ted Woosely testified that he was en route to the victim's residence when he received a radio transmission about the robbery suspects. Sergeant Woosely stopped the suspects on Doverside Drive. He asked if Newbell had any weapons and requested permission to search him for weapons. After receiving consent to search, he found nineteen twenty-dollar bills, four ten-dollar bills, and eleven five-dollar bills in Newbell's right front pocket.

On cross-examination, Sergeant Woosely said that he had no contact with the Appellant. Sergeant Woosely noted that he did not find any weapons in Newbell's possession.

Metro Police Officer Felipe Pereira testified that on August 12, 2013, he was being trained by Officer Otto. They were driving down Doverside Drive, responding to a call of an armed robbery in progress, when they received a radio report to look for a maroon Mustang and three suspects who were linked to the vehicle. Officer Pereira stopped the suspects as they were walking on the side of the road. Around the same time, other officers arrived on the scene. Officer Pereira said that the suspects seemed "surprised," in "shock," and "froze[n] in place." The officers separated the suspects and searched them for the weapon that had been used in the robbery. Officers Pereira and Otto focused mainly on the Appellant. During a brief pat-down, they did not find a weapon on the Appellant, and they placed him in a patrol car. Shortly thereafter, the officers decided to perform a second search of the Appellant. After they asked him to step out of the patrol car, they found a wallet lying on the floorboard near where the Appellant's feet had been. None of the suspects claimed ownership of the wallet. Officer Pereira opened the wallet and found the victim's driver's license. Officer Pereira returned the wallet to the victim. Afterward, Officers Pereira and Otto transported the Appellant to the police station and booked him.

On cross-examination, Officer Pereira said that the officers informed the suspects that they were being detained because of a robbery and that none of the suspects tried to evade the police. Officer Pereira said that he decided to perform a second search of the Appellant after a weapon was found on Pickett.

Metro Police Detective James Fuqua testified that on August 12, 2013, he was dispatched to Doverside Drive, where three suspects were detained in separate patrol cars. Upon his arrival, he was briefed by Detective Funk. Detective Fuqua decided to bring the victim to the scene for a "showup" identification. After the victim arrived, Detective Fuqua had the suspects step out of the patrol cars one at a time. The victim identified Newbell as the person who "dropped [him] off" at the end of his street immediately prior to the robbery. The victim said that the Appellant "looked similar" to the perpetrator with short hair. The victim identified Pickett as the perpetrator with

dreadlocks. Detective Fuqua said that the victim was cooperative with the police and that he was "very upset." The police found the victim's white pants on the ground beside the Mustang.

Detective Fuqua said that the police found a handgun and more than $1,450 on Pickett, the victim's wallet on the Appellant, and less than $500 on Newbell. Detective Fuqua returned all of the victim's property except the cash, which he kept to make an inventory of the exact amount.

Detective Fuqua said that at the time of the robbery, Newbell was twenty-six years old and six feet, one inch tall; the Appellant was eighteen years old and five feet, eight inches tall; and Pickett was sixteen years old and five feet, four inches tall.

On cross-examination, Detective Fuqua said that the police found a Cricket cellular telephone in the suspects' possession. He could not recall whether the victim identified the telephone as his.

The Appellant chose not to testify or put on proof. Newbell also chose not to testify but called William Little as a witness. Little testified that Newbell began working for him as "a laborer" on July 7, 2013. Little's records reflected that Newbell had been paid $346.09 for the week of August 6, 2013. Little knew that the paycheck had been cashed.

The jury found the Appellant guilty of aggravated robbery. The trial court sentenced the Appellant as a Range I, standard offender to ten years in the Tennessee Department of Correction.

On appeal, the Appellant contends that the trial court erred by refusing to allow the Appellant to play the 911 call, that the State failed to adduce sufficient proof that the Appellant committed aggravated robbery, and that the trial court erred when determining the length of the Appellant's sentence.

## II. Analysis

### A. 911 Call

The Appellant contends that the trial court erred by refusing to allow him to play a recording of the 911 call in which the victim described the robbery. The Appellant maintains that he wanted to play the recording to "underscor[e the victim's] uncertainty during his testimony regarding the description of the suspect who robbed him." The Appellant asserts that the recording was admissible under the excited utterance exception to the hearsay rule.

The State asserts that the Appellant has waived the issue by failing to include the recording of the 911 call in the appellate record. "It is well-settled that the duty to prepare a record which 'conveys a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of the appeal' rests on the appellant." State v. Bobadilla, 181 S.W.3d 641, 643 (Tenn. 2005) (quoting Tenn. R. App. P. 24(b)). Accordingly, "[w]hat is in the record sets the boundaries for what the appellate courts may review, and thus only evidence contained therein can be considered." Id. (citing State v. Miller, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987)). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). We conclude that the Appellant has waived this issue and that we must presume the trial court's ruling was correct.

## B. Sufficiency of the Evidence

Next, the Appellant challenges the sufficiency of the evidence sustaining his conviction. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be

a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

In the light most favorable to the State, the proof at trial revealed that the victim, the Appellant, and Newbell were among several people who spent the night at Garrett's apartment. While at the apartment, the victim "flash[ed]" $2,000 in cash that he had saved to buy a car. The next day, Newbell drove the victim home, leaving him at the end of his street. Within seconds of getting out of the car, the victim was "jumped" by two young black men who were wearing dark clothes and had their faces partially concealed by their shirts. The victim recognized the Appellant and noticed that he was wearing the same shorts he was wearing at Garrett's apartment earlier that day. The Appellant pointed a gun at the victim and threatened to shoot him if he did not "come out with everything." The victim recognized the Appellant's voice. The victim gave the perpetrators his wallet, which contained approximately forty dollars. The Appellant then ordered the victim to remove his white shorts. The victim threw his shorts on the ground, and the other perpetrator, Pickett, picked up the shorts. After the perpetrators fled the scene, the victim ran home, and he and his mother called 911. When the police learned that the perpetrators took the victim's white shorts, they searched for the suspects they had seen earlier that evening. The three suspects, Newbell, Pickett, and the Appellant, ultimately were stopped by the police while walking on Doverside Drive. During a search of the suspects, the police found seventy-three twenty-dollar bills wrapped around a .25 caliber semi-automatic pistol on Pickett; nineteen twenty-dollar bills, four ten-dollar bills, and eleven five-dollar bills on Newbell; and the victim's wallet on the Appellant. The victim was taken to the scene for a showup identification and positively identified Newbell as the man who drove him home immediately before the robbery. He identified Pickett as the perpetrator who picked up the victim's shorts and the Appellant as the perpetrator with the gun.

On appeal, the Appellant challenges the validity of the victim's identification of the Appellant as one of the perpetrators. The Appellant noted that the victim had been smoking marijuana "several hours prior to the robbery" and did not name the Appellant as a suspect when speaking with the 911 operator. The State responds that the proof is sufficient to sustain the Appellant's conviction.

This court has explained a perpetrator's identity "'is an essential element of any crime'" that the State must prove beyond a reasonable doubt. State v. Juan Diego Vargas, No. M2015-02458-CCA-R3-CD, 2017 WL 678839, at *5 (Tenn. Crim. App. at Nashville, Feb. 21, 2017) (quoting State v. Robert Wayne Pryor, No. M2003-02981-

- 9 -

CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. at Nashville, Apr. 19, 2005)), perm. to appeal denied, (Tenn. June 7, 2017). A perpetrator's identity "may be established by direct evidence, circumstantial evidence, or a combination of the two." Id. Generally, "[t]he credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). "It is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

The victim testified he was positive that the Appellant was the perpetrator who pointed a gun at him and demanded his property. The jury heard the proof and clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the State adduced sufficient evidence to sustain the Appellant's conviction.

C. Sentencing

As his final issue, the Appellant contests the sentence imposed by the trial court. This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of

- 10 -

punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

At the sentencing hearing, Metro Police Officer Regina Lewis testified that on September 4, 2015, she and another officer stopped a vehicle that matched a car used the previous night in "a robbery/kidnapping." The Appellant was in the front passenger seat, and his brother, Lacorious Fuller,[1] was driving. During a search of the vehicles, Officer Lewis found a loaded gun under the driver's seat. Neither man claimed the gun. Both men were issued misdemeanor citations for criminal trespass, and the Appellant was issued a misdemeanor citation for possession of the gun. The State informed the trial court that the Appellant's two citations were pending in general sessions court.

On cross-examination, Officer Lewis acknowledged that the police later learned the Appellant's vehicle was not involved in the "robbery/kidnapping." When asked why the Appellant, not Lacorious, was cited for possession of the gun, Officer Lewis responded:

Where we located the gun it was very probable that the

---

[1]Because the Appellant and Lacorious Fuller share a last name, we will refer to Lacorious by his first name for clarification. No disrespect is meant.

passenger had reach of it as well because it wasn't under the front of the seat. It was in the back of the seat. It was behind the back of the seat. So it would have been very easy for a passenger to reach back up and under the seat from behind. And that's why he was charged with it. Plus Lacorious could lawfully have the gun in the car, but he did not claim it.

Lacorious Fuller, the Appellant's twenty-seven-year-old brother, testified on the Appellant's behalf. Lacorious said that on September 4, 2015, he went to James Cayce housing, where his mother lived, to pick up the Appellant. Thereafter, he and the Appellant were stopped by the police. Larcorious told the police that the car and the gun belonged to him. Lacorious stated that he had a permit to carry the gun, which he produced for the court. Lacorious maintained that the Appellant did not know the gun was in the car.

Lacorious said that he was "shock[ed]" by the Appellant's conviction of aggravated robbery but acknowledged that "coming from my environment a lot of wrong go wrong. A lot of good people turn bad." Lacorious said that he worked for Federal Express, performed maintenance at Chimney Top Apartments, and "stayed out of trouble."

On cross-examination, Lacorious said that another officer, not Officer Lewis, asked him who owned the gun found in the car. Lacorious told the officer that "anything in that car is mines [sic]." Lacorious said that one of the Appellant's citations "quotes that I took that gun charge, that I told them that it was mines [sic]."

Upon questioning by the trial court, Lacorious said that his trespassing citation was dismissed.

The Appellant testified that he was twenty years old and that he was eighteen years old when he was charged with aggravated robbery. He attended school through the eleventh grade and was taking classes to earn his general equivalency diploma (GED).

The Appellant said that on July 4, 2015, while he was on bond for this offense, he was visiting a family member when a "car swerved up," and "a couple of guys just let[] off shots and one impacted my leg." The Appellant said that in August 2015 while he was still on bond, he "picked up a weapons charge." He acknowledged that he was carrying a weapon, explaining that he had been shot the previous month, that he was scared, and that he was carrying the weapon for protection. The Appellant said that where he lived "sometimes can be dangerous."

The Appellant acknowledged that he was convicted of simple possession of

- 12 -

marijuana in February 2013 and of trespassing and simple possession in June and July of 2014. The Appellant said that he received several trespassing charges for staying with his mother in James Cayce housing.

The Appellant acknowledged that in August 2014, he was convicted of attempting to escape custody. He explained that the police had handcuffed him and put him in the back of a police car for trespassing. The Appellant said that one of his wrists was broken, that the handcuffs were tight and hurt his broken wrist, and that he slid the handcuff off of the broken wrist. The Appellant said that he told the police officer he had taken off the handcuff and explained his reasoning.

The Appellant acknowledged that he "decided to seize the opportunity" to rob the victim after seeing him "flashing around a lot of money." The Appellant apologized to the victim and said that he and the other perpetrators "made a bad decision."

When asked by defense counsel why the trial court should grant the Appellant the minimum sentence, the Appellant said that he wanted to earn a GED and get a job after he was released so he could "set a better example" for his younger brothers and other "younger peers."

On cross-examination, the Appellant acknowledged that he took the victim's wallet but said that Pickett had the gun and demanded the victim's property. The Appellant said that he did not "blam[e] everything on" Pickett, noting that "[w]e're all equally accountable for our actions." The Appellant agreed that "it was [his] idea" to rob the victim. He conceded that he was on probation for simple possession of marijuana at the time he committed the instant offense and that "as a juvenile, [he] had gotten pretrial diversion for a theft and simple possession." He further conceded that while he was on bond for the instant case, he "pled guilty to seven different citations or warrants" and to "possession of a handgun under the influence."

On redirect examination, the Appellant clarified that he did not come up with the plan to rob the victim and that he could not "quite remember whose idea it was."

The trial court found that the Appellant was a Range I, standard offender subject to a sentence between eight and twelve years. The trial court applied enhancement factor (1), that the Appellant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1). The trial court noted that the Appellant had nine misdemeanor convictions and a history of marijuana use. The trial court also applied enhancement factor (2), that the Appellant was a leader in the commission of an offense involving two or more criminal actors. Id. at (2). The trial court based the application of that factor on the Appellant's "being the one with the gun and sort of ordered everybody else around."

- 13 -

The trial court also applied enhancement factor (13) because the Appellant was on probation when he committed the instant offense. Id. at (13)(C). The trial court did not apply any mitigating factors. See Tenn. Code Ann. § 40-35-113. The trial court sentenced the Appellant to ten years.

On appeal, the Appellant contends that the trial court erred by applying enhancement factor (2). Tenn. Code Ann. § 40-35-114(2). The Appellant asserts that he "was no more, or less, culpable than his other co-defendants." However, the trial court accredited the victim's testimony that the Appellant held the gun and demanded the victim's property. This court has previously observed that "[a] determination of witness credibility is entrusted to the trial court as the fact finder, which may be considered during sentencing." State v. Ryan James Howard, No. E2011-01571-CCA-R3-CD, 2013 WL 132665, at *17 (Tenn. Crim. App. at Knoxville, Jan. 10, 2013). Moreover, the "enhancement for being a leader in the commission of an offense does not require that the [Appellant] be the sole leader but only that he be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The record supports the trial court's application of enhancement factor (2).

The Appellant also contends that the trial court should have applied mitigating factor (6), that the Appellant, because of youth or old age, lacked substantial judgment in committing the offense. Tenn. Code Ann. § 40-35-113(6). Ordinarily, courts should consider "the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." State v. Adams, 864 S.W.2d 31, 34 (Tenn. 1993). The trial court did not err by refusing to apply this mitigating factor. Thus, we conclude that the trial court did not err in sentencing the Appellant.

## III.  Conclusion

In sum, we conclude that the evidence was sufficient to sustain the Appellant's conviction of aggravated robbery and that the trial court did not err in sentencing the Appellant. Accordingly, the judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE

- 14 -